Brandon S. Reif (SBN 214706)
Rebecca E. MacLaren (SBN 211788)
**WINGET SPADAFORA & SCHWARTZBERG LLP**
1900 Avenue of the Stars, Suite 450
Los Angeles, CA 90067
Telephone:  310.836.4800
Facsimile:  310.836.4801
Email: Reif.B@wssllp.com, MacLaren.R@wssllp.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM DAN GOTSES, an individual, | Case No.: |
| Plaintiff, | **CIVIL COMPLAINT** |
| v. | |
| U.S. BANCORP, a Delaware corporation; U.S. BANCORP INSURANCE SERVICES, LLC, a Wisconsin limited liability company; U.S. BANCORP INVESTMENTS, INC., a Delaware corporation; U.S. BANK, a national bank association; and DOES 1 THROUGH 10, | |
| Defendants. | |

## **PARTIES**

1.     Plaintiff William Dan Gotses ("Plaintiff") is, and all relevant times was, an individual resident of San Diego, CA, and conducting business in Los Angeles and San Diego Counties.

2.     Defendant U.S. BANCORP ("HOLDING") is a bank holding company in the financial services industry that is headquartered in Minneapolis, Minnesota and incorporated in Delaware.  HOLDING conducts business within Los Angeles and San Diego Counties.

3.     Defendant U.S. BANCORP INSURANCE SERVICES, LLC, ("INSURANCE") is an insurance agency registered with the various state insurance agencies in which it conducts insurance transaction business. INSURANCE is headquartered in Minneapolis, Minnesota and incorporated in Wisconsin.  It conducts business within Los Angeles and San Diego Counties.  It is a wholly owned subsidiary of HOLDING.

4.     Defendant U.S. BANCORP INVESTMENTS, INC., INC. ("INVESTMENTS") is a broker-dealer registered with the Financial Industry Regulatory Authority ("FINRA"), a non-government agency that regulates the securities industry under the authority of the United States Securities and Exchange Commission.  INVESTMENTS is headquartered in Minneapolis, Minnesota and incorporated in Delaware.  It conducts business within Los Angeles and San Diego Counties.  It is a wholly owned subsidiary of HOLDING.

5.     Defendant U.S. BANK ("BANK") is a national bank association chartered under the laws of the United States (Charter No. 24).  BANK is headquartered in Minneapolis, Minnesota.  It conducts business within Los Angeles and San Diego Counties.  It is a wholly owned subsidiary of HOLDING.

6.     INVESTMENTS is the BANK's FINRA-licensed member firm aka broker-dealer unit that employs over six hundred (600) FINRA-licensed associated persons aka financial advisors ("FAs") nationwide.  INVESTMENT's FAs provide

financial and investment services to mostly retail customers across the United States and manage over five hundred million dollars ($500 million) in client assets.

7.      INSURANCE is the BANK's insurance agency that employs over three hundred (300) insurance agents, aka insurance representatives ("IRs"), nationwide that are appointed with the various state insurance agencies in which insurance transactions occur.  INSURANCE provides insurance services and insurance products to customers across the United States.

8.      HOLDING is a corporate conglomerate that controls INVESTMENTS, INSURANCE and the BANK as its parent company.  HOLDING is set up as the parent company with its subsidiaries (INVESTMENTS, INSURANCE and the BANK) as affiliates of one another to maximize the fluidity and referral relationships on behalf of each other and HOLDINGS.  HOLDING is currently ranked seventh (7th) of the largest banks in the United States.  It provides banking, investment, mortgage, trust, and payment services products to individuals, businesses, governmental entities and other financial institutions. It has 3,106 branches and 4,842 Automated Teller Machines (ATMs)  in the Midwestern United States.

9.      Plaintiff is unaware of the true names and capacities, whether individual, corporate, agent, representative, or otherwise, of the Defendants named herein as DOES 1 through 10 and therefore sues such Defendants by such fictitious names pursuant to Local Rule 19-1.  Plaintiff is informed and believes, and thereon alleges, that each of the Defendant DOES is in some manner responsible for the acts and occurrences alleged herein; and that each DOE Defendant is therefore liable to Plaintiff as alleged herein. Plaintiff will seek leave of Court pursuant to Federal Rule of Civil Procedure 15 to amend this Complaint to set forth the true names and capacities of these fictitiously named Defendants when they are ascertained.

10.   Wherever appearing in this Complaint, each and every reference to "Defendants" is intended to and shall reference all Defendants in this action, and each of them, including, but not limited to, HOLDING, INVESTMENTS, INSURANCE and the BANK and all fictitiously named Defendant DOES.

11.   Plaintiff is informed and believes, and on that basis, alleges that each Defendant was the agent, principal, servant, representative, employer, employee, joint venturer, co-conspirator, partner, parent, subsidiary, affiliate and/or alter ego of each and every other Defendant and, in doing the things hereinafter alleged, was acting within the course and/or scope of such authority as the agent, principal, servant, representative, employer, employee, joint venturer, co-conspirator, partner (of any kind), parent, subsidiary, affiliate, and/or alter ego with the authority and consent of the remaining co-Defendants except where otherwise specifically described.

12.   Plaintiff is informed and believes, and on that basis, further alleges that Defendants conspired to and did commit the inequitable, tortious and/or unlawful acts herein alleged in furtherance of their conspiracy to accomplish their unlawful purposes. In so doing, Defendants, and each of them, caused injury to Plaintiff.

## JURISDICTION AND VENUE

13.   Jurisdiction is proper in this District under 28 U.S.C. § 1331.

14.   Jurisdiction is proper in this District under 28 U.S.C. §1332 as between citizens of different States with a controversy that exceeds $75,000, exclusive of interest and costs.

15.   Venue is proper in this District under 28 U.S.C. §§1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims against Defendants occurred in this District.  Specifically, Plaintiff's allegations and his damages occurred, in significant part, in this District.  Plaintiff filed all his claims for Family Medical Leave Act ("FMLA") and reported to Defendants the

1   misconduct he witnessed that resulted in actionable retaliation in this District.

2       16.  Defendants are non-resident corporations and are subject to venue in this

3   District under 28 U.S.C. §1391(c)(2) and (d).  Specifically, Defendants conduct

4   regular business in this District and they recruited, managed, supervised and

5   ultimately terminated Plaintiff from its office headquarters in this District.

6

7   **<u>SUMMARY OF THE CLAIM</u>**

8       17.  Plaintiff is suing Defendants for disability discrimination, harassment and

9   retaliation, violation of the whistleblower statute and the failure to pay wages and

10  reimburse business expenses, among other claims.

11      18.  Plaintiff was the victim of recruitment fraud to join a financial

12  conglomerate without any moral or ethical consciousness.  During his five years of

13  employment with Defendants, Plaintiff witnessed Defendants' management

14  encourage and enable serious violations of securities, FINRA, insurance, and

15  banking laws and/or rules and/or regulations, thereby prioritizing profits over

16  compliance with the law.

17      19.  Plaintiff dutifully reported to Defendants' bankers and/or principals

18  and/or management and/or senior executives the serious violations of securities,

19  FINRA, insurance, and banking laws and/or rules and/or regulations and unethical

20  behavior he witnessed in the workplace.  In response, Defendants discriminated,

21  harassed and retaliated against Plaintiff, and eventually terminated him by ambush

22  on December 2, 2016 while he was on protected leave pursuant to the Family and

23  Medical Leave Act of 1993 (FMLA/CFRA) and the Americans with Disabilities

24  Act of 1990 (ADA).  He had reported numerous employees for discrimination

25  and/or alleged fraud and/or bad acts, including but not limited to bankers, sales

26  people, compliance officers and management. In retaliation, he was promptly

27  escorted off Defendants' premises without his personal effects.  He was not paid

28  his due and owing wages.  He was not reimbursed his reimbursable business

expenses.  He was unceremoniously ambushed and fired after five years of dutiful service, including but not limited to just receiving the Pinnacle award for production and clean compliance in a textbook example of workplace retaliation and disability discrimination and harassment.  In contrast, Defendants boast to the world on their website that they are the most ethical firm in the United States and have won awards for their ethics for three consecutive years:

> U.S. Bank, the fifth largest commercial bank in the United States, announced today that it has been recognized by the Ethisphere Institute, the global leader in defining and advancing the standards of ethical business practices, as a 2017 World's Most Ethical Company®. This marks the third consecutive year U.S. Bank has earned this recognition. …It is truly an honor to be named a World's Most Ethical Company for the third consecutive year," said Richard Davis, chairman and chief executive officer of U.S. Bank. "As a financial institution, we understand the importance of building and maintaining trust with our customers, communities, and shareholders. And, we are very proud of how the U.S. Bank team strives to be the most trusted choice and how their efforts impact the lives of our customers. I congratulate all of our employees and thank them for their commitment to the highest level of ethics and integrity.

A true and correct screenshot of Defendants' website, as it appeared on November 30, 2017, at https://www.usbank.com/newsroom/news/us-bank-named-a-worlds-most-ethical-company.html, is attached hereto as Exhibit A.

20.     Furthermore, Defendants boast on Wall Street that they are the best Banking firm regarding profits and retained earnings; in reality, Plaintiff noticed and timely reported ethical breaches and fraud, he experience blatant retaliation, discrimination and was punished for ethically reporting bankers, assistants, management, compliance and the firm for their alleged violations of securities, FINRA, insurance, and banking laws and/or rules and/or regulations.

/ / /

/ / /

<u>**FIRST CAUSE OF ACTION FOR BREACH OF**</u>

<u>**CONTRACT AND BREACH OF THE IMPLIED**</u>

<u>**COVENANT OF GOOD FAITH AND FAIR DEALING**</u>

**[Against All Defendants and DOES 1 to 3]**

21.    Plaintiff repeats and incorporates herein by reference the allegations in the paragraphs set forth above as though fully set forth herein.

22.    Between June 2011 and November 18, 2011, Defendants aggressively recruited Plaintiff, then top producer at Merrill Lynch Wealth Management, to induce him to join Defendants.

23.    Paul Reynolds ("Reynolds") was Defendants' Division Manager at the time and had known Plaintiff since 1996.  Reynolds, on behalf of Defendants, solicited Plaintiff to join Defendants as a Financial Advisor and Insurance Specialist to develop and expand Defendants' California retail business operations.

24.    Defendants, via Reynolds, represented to Plaintiff that Defendants' recruitment package was more lucrative than a recruitment package Plaintiff had recently been offered competing broker-dealer.  For instance, Defendants offered Plaintiff including, but not limited to guaranteed pay, bonuses, exclusive territories, his choice of office locations, and his choice of Defendants' top customers residing in California.  Defendants also assured Plaintiff that they would provide him with a highly skilled administrative team to ensure the smooth transition of Plaintiff's business, which included over 2,000 customers, $400,000,000 in assets under management for advisory, brokerage and insurance services, and annual production in excess of $1,500,000.

25.    In reliance on Defendants' representations in the recruiting process, Plaintiff accepted the offer to join Defendants on or around October 7, 2011 and started employment on November 18, 2011.  The terms of the deal were memorialized in a letter agreement signed by Plaintiff and Reynolds on behalf of Defendants.

CIVIL COMPLAINT

26.     Parts of the deal were further memorialized in a written Employment Agreement dated October 7, 2011.

27.     Plaintiff was hired as an employee of the BANK, INVESTMENTS and INSURANCE with the title of Financial Advisor and Insurance Specialist as of November 18, 2011; titles were immediately changed to Senior positions.  Plaintiff was offered, including but not limited to, cash advance lump-sum payment of $455,000 and four annual backend bonuses that started in year one at $65,000 and increased by year four to $162,500.  Plaintiff received his lump-sum payment and his first three annual bonuses. He was never paid his fourth year annual bonus of $162,500, even though Defendants promised to pay the bonus. He also was never paid certain bonuses, including but not limited to monthly and quarterly bonuses and specific stock options even though Defendants promised to pay them to him. Defendants also promised, pursuant to California law, to pay Plaintiff for his reimbursable business expenses.  However, Defendants never reimbursed Plaintiff for the expenses he incurred from October 2011 to December 2016, despite explicit knowledge that Plaintiff incurred the expenses and Defendant's admission that they owed and promised to pay Plaintiff full reimbursement by December 31, 2016.  Defendant reaffirmed this promise to pay full reimbursement of expenses debt to Plaintiff in emails and orally, including but not limited to the oral promise made in front of witness(es) and Plaintiff on the day of his termination.

28.     Defendants also promised Plaintiff that he would be given the exclusive right to manage three of Defendants' lucrative territories in Point Loma, Pacific Beach and University Town Center/La Jolla (collectively, the "Territory") for the four years of his bonus period.  Plaintiff was never granted the exclusive Territory he was promised during his recruitment, and instead worked exclusively in the Point Loma branch and undesirable branches. Defendants enticed other recruits to join Defendants with similar illusory promises of an exclusive region and gave some of these recruits Plaintiff's desirable branches and clients.

Defendants further promised Plaintiff that he would have the exclusive right to service Defendants' all customers residing in the Territory, including but not limited to the top 30 existing investments customers and would have full access to and cooperation from Defendants' Private Banking team and its customers, who each had $3,000,000 minimum in net worth.  However, Plaintiff was never granted the top 30 customers he was promised during his recruitment, nor was he given access to Defendants' Private Banking team or its customers.   Instead, Defendants enticed other recruits to join Defendants with similar promises of access to high-net worth clientele.

29.    Defendants made numerous other promises, including but not limited to promising Plaintiff that he would have a team of experienced, full-time professionals who only specialized in transitioning top producer's clientele to seamlessly transition his book of business to Defendants.  However, once Plaintiff joined Defendants, they initially assigned him one part-time, inexperienced employee to handle the transition of Plaintiff's entire book of business. Defendants also provided other staff members who were likewise inexperienced in transitioning a large volume of top producing clients. Defendants thus failed miserably and materially to assist Plaintiff transition the book of business to Defendants, which resulted in the loss of significant business, relationships and income.

30.    Defendants' misconduct damaged Plaintiff in an amount to be proven at trial.

31.    Defendants breached their contracts with Plaintiff by failing to perform the terms set forth herein.

32.    Defendants' breach proximately caused damages to Plaintiff, including but not limited to loss of income, loss of earning capacity, including business reputational damages and good will, unreimbursed expenses, and unpaid wages in an amount to be proven at trial.

33.     Every contract has an implied covenant of good faith and fair dealing. Defendants breached this covenant as set forth here and their breach proximately caused damages to Plaintiff, including but not limited to loss of income, loss of earning capacity, including business reputational damages and good will, unreimbursed expenses, and unpaid wages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION FOR DISABILITY DISCRIMINATION, HARRASSMENT AND RETALIATION

### [Against All Defendants and DOES 4 - 6]

34.   Plaintiff repeats and incorporates herein by reference the allegations in the paragraphs set forth above as though fully set forth herein.

35.   At all times relevant, for approximately five (5) years until his wrongful termination on or about December 2, 2016, Plaintiff was employed as a Senior Financial Advisor and Senior Insurance Specialist by Defendants BANK, INVESTMENTS AND INSURANCE, who were at all times Plaintiff's employers, managers and supervisors.

36.   At all times relevant, Defendants were fully informed of Plaintiff's diagnosed and documented disabilities for: (1) Vestibular Disequilibrium; (2) Vertigo; and (3) Optokinetic Sensitivity.  Plaintiff's disabilities cause, among other things, dizziness, imbalance, loss of equilibrium, spatial disorientation and visual disturbances, which become exacerbated by stress.

37.   Plaintiff openly discussed and documented his disabilities with Defendants prior to and at the outset of his employment so that he could be reasonably accommodated to ensure he fully performed his work duties to the best of his abilities.

38.   Defendants failed to provide a clean workplace for Plaintiff by allowing the presence of nearly 20 non-service dogs in the office on a daily basis.  Plaintiff was thus compelled to disclose to Defendants that he had a Level 5 allergy to pet

dander, dust and mold. Plaintiff regularly complained to his managers and supervisors that the office was unsanitary and uninhabitable due to the dogs' shedding, urination, regurgitation and defecation, dust and mold.  Plaintiff also regularly complained to his managers and supervisors that his allergic reactions were debilitating and exacerbated the symptoms of his existing disabilities, including dizziness, unsteadiness and visual disturbances.  Plaintiff asked his managers and supervisors to ban the non-service dogs and regularly clean the office carpets and disinfect the workplace and remove the mold.  Defendants ignored his complaints and his reasonable accommodation requests.

39.   At various times between November 2011 and December 2016, Plaintiff was granted intermittent leave pursuant to the CFRA, FMLA, and/or other approved medical leave, in order to recuperate and manage the effects of his disabilities. Plaintiff kept Defendants informed of his disabilities at all relevant times Plaintiff continued to perform his work duties at acceptable levels throughout his employment with Defendants, and he was lauded with various accolades and above-average periodic performance reviews.

40.   In addition to his excellent work performance, Plaintiff was vigilant about his ethical duties.  During his employment, Plaintiff reported to Defendants' supervisory and compliance department that Defendants' employees routinely engaged in violations of securities, FINRA, insurance, and banking laws and/or rules and/or regulations and other breaches of trust and unethical conduct that violated industry and Defendants' policies, code of ethics and their compliance manuals.

41.   During Plaintiff's employment with Defendants, he reported to Defendants' supervisors, managers and senior executives, and each of them, that a non-securities licensed employee in Defendants' Point Loma office was engaged in rampant misconduct, including but not limited to: opening new accounts for customers without the customers' consent or their authentic signatures; soliciting

customers to purchase financial products and trading of securities.  Plaintiff also reported the same employee for impersonating or attempting to impersonate one of Plaintiff's customers in order to complete unauthorized securities solicitations and transactions. This same employee engaged in trading and solicitation of securities and/or insurance products without the proper licenses and training.  Plaintiff reported these serious instances of unethical and illegal conduct in the office to Defendants' senior personnel, their compliance officers, their Human Resource senior employees and others in Defendants' employ with seniority.  Defendants simply failed to supervise, ignored the complaints, reached conclusions of no wrongdoing without an investigation and concealed the misconduct.  Eventually, the employee in question was terminated, months after Plaintiff and other employees reported rampant and reckless misconduct.

42.   During Plaintiff's employment with Defendants, he also reported to Defendants' supervisors, managers and senior executives, and each of them, numerous securities violations by other employees to Defendants, including instances of unauthorized trading and falsification of account documentation. Plaintiff also reported that an unlicensed employee illegally engaged in securities transaction(s).  For example, Plaintiff inherited accounts from two of his managers, and reported violations in connection with both.  Specifically, the Plaintiff reported the first manager for retaining and distributing to clientele sales literature and prospectuses dated over the regulatory limits, for buying C shares of the Lord Abbott Funds then switching to A shares, for complaints from multiple clients, for gaming ages on fixed and/or variable annuities contracts, for complaint from clients who reported losses over $5,000 and for a complaint by a client who claimed he was never informed of the sales charges on investment products.

43.   Plaintiff also reported a second manager, George Fakier ("Fakier"), for filling out securities proxy votes for a client numerous times, for a complaint by another client that Fakier caused the client losses in excess of $5,000, and for

threatening and retaliating against Plaintiff for not sharing in a substantial commission with Fakier.

44.   Plaintiff also reported a compliance officer for providing tax advice, misinforming the client of the features and benefits of her investments, and for client's alleged complaints of discrimination.

45.   Plaintiff immediately reported these and other serious issues to Defendants' management.  Each time, Defendants buried the incident and furthered their retaliation against Plaintiff.

46.   Plaintiff also requested numerous times, orally and in writing, to exclude the fees from advisory accounts and properly reimburse those advisory clients who held cash positions in their advisory accounts.  In other words, Defendants were refusing to exclude cash positions from the amount used to calculate the fees for assets under management.  Plaintiff complained about this policy and was told that the firm would make an "exception" for Plaintiff's customers at the manager's discretion. This contradicted the recruitment promises made by Defendants and was used against Plaintiff in retaliation.

47.   In response to Plaintiff's reporting of misconduct by other employees, managers, supervisors, compliance officers and bankers, and despite Defendants' confirmation that these instances constituted violations, Defendants began a campaign to discredit and retaliate against Plaintiff, and used his disabilities as leverage in that war.  First, Defendants began taking part of the Territory and customers away from Plaintiff, undermining his income and his ability to earn contractual performance bonuses.  Defendants also threatened Plaintiff with termination, gave him a (pre-textual) bad annual review, wrongfully delayed or rejected certain securities trades, removed Plaintiff from his position advising the CEO, and other retaliatory actions to be proven at trial.

48.   In addition, Defendants, through Fakier, demanded that Plaintiff personally transcribe all of his notes from the prior five years regarding his

customers into a new computer program that Defendants were implementing, despite the fact that Plaintiff had previous approval to have those notes in the prior system. Plaintiff informed Fakier that this was an insurmountable task in light of Plaintiff's disabilities, and that it would take even a non-disabled staff person over a year to manually finish the task. Plaintiff requested that the task be outsourced to the technical team within the firm, which represented to the Plaintiff and his assistant that the technical team would be able to finish the task within two weeks. Fakier refused to accommodate Plaintiff, and demanded that Plaintiff complete the task himself within 60 days. Fakier admitted to Plaintiff that he knew Plaintiff could not perform this task by the deadline imposed by Fakier, and that Fakier would use this failure as a reason to terminate Plaintiff.

49. Next, Dolores McNeely ("McNeely"), bank district manager for Defendants' Southern California location, along with two other bank managers, told Plaintiff that McNeely would prohibit her branch employees from referring customers to Plaintiff unless he agreed to provide free referrals to her branches, including referrals based upon securities and insurance sales results. This threat was a breach of the typical operating procedure among branches, which Plaintiff reported to Defendants. Furthermore, two bank managers told Plaintiff that they would prefer a "female" representative in their territory. In response, Defendants prohibited Plaintiff from entering his office for approximately 4 to 6 months, while Defendants purportedly investigated the matter. This caused Plaintiff to lose significant income, the ability to make his contractual goals and bonuses, and business reputation and good will.

50. The foregoing action, among others, caused Plaintiff an extraordinary amount of stress, which further exacerbated the symptoms of his disabilities. In February 2016, Plaintiff notified Defendants that he would be taking intermittent medical leave pursuant to the FMLA.

51.   Also in or around February 2016, Fakier submitted a performance review for Plaintiff for the year 2015 that purported to memorialize that Plaintiff had developed a negative attitude and an unacceptable "tone" with Defendants' management.  This in direct retaliation of Plaintiff reporting Reynolds, compliance officers and Fakier himself for fraud and/or bad acts.

52.   During the same time period, Defendants engaged in several additional bad acts, including, but not limited to Defendants' paralegal(s) submitting a false declaration in a lawsuit declaring that Plaintiff did <u>not</u> have any disabilities. Defendants' false statement was part of their wrongful conduct that harmed Plaintiff.  Around the same time, Defendants' staff concealed from Plaintiff that legal papers were served at his office, which resulted in the entry of his default in the lawsuit.  Plaintiff incurred no less than $100,000 in attorneys' fees and costs as a result of Defendants' wrongful conduct.

53.   Due to the stress of the events set forth here, Plaintiff was on intermittent CFLA/FMLA on November 23, 25, 28 and 30, 2016 and December 1 and 2, 2016, in addition to preceding periods of time.

54.   On or about November 30, 2016, Plaintiff had a conference call with US Bancorp assistant Sami Tuqan and Fakier to discuss routine year-end matters, including Plaintiff's performance bonus.  Fakier promised Plaintiff that Defendants would pay Plaintiff his $162,500 annual bonus, and that Defendants would also finally pay Plaintiff for the expenses he had incurred from 2011 to the present.

55.   Plaintiff was on intermittent CFLA/FMLA from November 30 to December 2, 2016.  On December 1, 2016, Plaintiff called the Hartford, which manages Defendants' disability claims, to report that he would be continuing his medical leave.

56.   While on CFLA/FMLA, Defendants terminated Plaintiff on December 2, 2016 in violation of the legal protections afforded to him.

57.   In light of the foregoing facts, Defendants and each of them discriminated, harassed and retaliated against Plaintiff on the basis of his disabilities.

58.   The acts and conduct of Defendants, and each of them, violated California Government Code §12940 et seq.  The statute impose certain duties upon Defendants, and each of them, concerning harassment, discrimination and retaliation against persons, such as Plaintiff, on the basis of disabilities and the prohibition of disabilities harassment, discrimination and retaliation.  The statutes were intended to prevent the type of injury and damage here.  Plaintiff was, at all times relevant, an employee with disabilities and within the protected class covered by California Government Code §12940 et seq. prohibiting disability discrimination, harassment and retaliation in the workplace.

59.   Government Code Section 12940(n) requires an employer to engage in a good faith interactive process with a disabled employee to ascertain effective reasonable accommodations.   Defendants' failure to do so is a separate violation of FEHA.

60.   Defendant Company violated Government Code Section 12940(n) by failing to engage in said good faith interactive process with Plaintiff over his need for reasonable accommodations to allow him to perform the essential functions of his job.

61.   By the acts and conduct set forth, Defendants, and each of them, violated the statute, knew about, or should have known about, and failed to investigate and/or properly investigate, prevent or remedy the disability harassment, discrimination and retaliation.  The acts and conduct set forth were sufficiently pervasive so as to alter the conditions of employment, and created an abusive working environment.  When Plaintiff was harassed, discriminated against and retaliated against, his disabilities and complaints about the unlawful conduct were motivating reasons and/or factors in Defendants' conduct.

62.  Plaintiff filed timely charges and complaints of disability discrimination, harassment and retaliation with the California Department of Fair Employment and Housing and has received Notice(s) of Right to Sue in a California Superior Court pursuant to California Government Code §12965(b).  Plaintiff has therefore exhausted his administrative remedies.  Plaintiff's complaints will be produced in discovery in the case.  Attached as <u>Exhibit B</u> is the Right to Sue Notice and is incorporated by reference to this complaint.

63.  Defendants, and each of them, directly and legally caused Plaintiff to suffer actual damages pursuant to California Civil Code §3333 including but not limited to loss of earnings and future earning capacity, including business reputational damages and good will, medical and related expenses for care and procedures both now and in the future, attorneys' fees, and other pecuniary loss not presently ascertainable, for which Plaintiff will disclose them as they are developed in discovery.

64.  Defendants, and each of them, directly and legally caused Plaintiff to suffer numerous internal and external injuries and suffering, including but not limited to onset of his disabilities, severe fright, humiliation, shame, shock, pain, discomfort, anxiety and lost confidence to successfully regain the workforce. The exact nature, extent of his injuries, duration and permanence of his injuries are not known, but Plaintiff will disclose them as they are developed in discovery.

65.  Defendants, and each of them, directly and legally caused Plaintiff to incur expenses for medical care and laboratory costs during the period of Plaintiff's disability, and is informed and believes and alleges that he will incur expenses in the future that are presently unknown, but Plaintiff will disclose them as they are developed in discovery.

66.  Since the incidents, Plaintiff has been unable to engage fully in his occupation and is informed and believes and alleges that he will incapacitated and unable to perform his usual work for an indefinite period of time in the future and

that his damages are presently unknown, but Plaintiff will disclose them as they are developed in discovery.

67.  Defendants, and each of them, directly and legally caused Plaintiff to suffer and continues to suffer severe and permanent emotional and mental distress and anguish, humiliation, embarrassment, fright, shock, pain, discomfort and anxiety. The exact nature of his injuries is presently unknown, but Plaintiff will disclose them as they are developed in discovery.

68.  Plaintiff has been generally damaged in an amount to be proven at trial.

69.  The misconduct of Defendants, and each of them, was willful, wanton, malicious, intentional, oppressive and despicable and were done with willful and conscious disregard of the rights, welfare and safety of Plaintiff and were done by managerial agents and employees of Defendants and with the express knowledge, consent and ratification of managerial agents and employees of Defendants thereby justifying the awarding of punitive and exemplary damages in an amount to be proven at trial.

70.  As a result of the discriminatory acts of Defendants, and each of them, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as specifically provided in California Government Code §12965(b).

## THIRD CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### [Against All Defendants and DOES 4 - 6]

71.  Plaintiff repeats and incorporates herein by reference the allegations in the paragraphs set forth above as though fully set forth herein.

72.  Defendants' above-described misconduct and actions toward Plaintiff was outrageous and was intended to cause, and did in fact cause, Plaintiff to suffer severe and permanent emotional and mental distress and anguish, humiliation, embarrassment, fright, shock, pain, discomfort and anxiety.

Plaintiff has been damaged in an amount to be proven at trial.

73.   The misconduct of Defendants, and each of them, was willful, wanton, malicious, intentional, oppressive and despicable and were done with willful and conscious disregard of the rights, welfare and safety of Plaintiff and were done by managerial agents and employees of Defendants and with the express knowledge, consent and ratification of managerial agents and employees of Defendants thereby justifying the awarding of punitive and exemplary damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION FOR VIOLATION
## OF FEDERAL FAMILY & LEAVE ACT (FMLA)
### [Against All Defendants and DOES 7 to 8]

74.    Plaintiff repeats and incorporates herein by reference the allegations in the paragraphs set forth above as though fully set forth herein.

75.   Plaintiff was Defendants' employee who qualified for leave under FMLA, 29 U.S.C.A. §2611(2) and 29 C.F.R. §825.110.

76.   Defendants are subject to the FMLA, 29 U.S.C.A. §2611(4).

77.   Plaintiff had, at all times relevant, disabilities known to Defendants that have rights under the FMLA, 29 U.S.C.A. §2611(11).

78.    Plaintiff received intermittent leave in compliance with FMLA for his known disabilities.  Plaintiff provided Defendants' insurer, Hartford, with the FMLA completed paperwork and medical certification to support his FMLA.

79.   Defendants fired Plaintiff while he was on FMLA leave.

80.   Defendants invented a pre-textual basis for Plaintiff's termination, even though Defendants' discrimination, harassment and retaliation for his FMLA leave were a substantial factor in their decision to terminate him.

81.   Defendant has not been reinstated by Defendants.

82.   Plaintiff has been generally damaged in an amount to be proven at trial.

83.   The misconduct of Defendants, and each of them, was willful, wanton, malicious, intentional, oppressive and despicable and were done with willful and conscious disregard of the rights, welfare and safety of Plaintiff and were done by managerial agents and employees of Defendants and with the express knowledge, consent and ratification of managerial agents and employees of Defendants thereby justifying the awarding of punitive and exemplary damages in an amount to be proven at trial.

84.   As a result of Defendants' misconduct, and each of them, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as specifically provided in 29 U.S.C §2617(a)(3).

85.   As a result of Defendants' misconduct, and each of them, Plaintiff is entitled to liquidated damages equal to his actual damages as allowed plus interest.

## FIFTH CAUSE OF ACTION FOR VIOLATION
## OF CALIFORNIA FAMILY RIGHTS ACT (CFRA)
### [Against All Defendants and DOES 7 to 8]

86.    Plaintiff repeats and incorporates herein by reference the allegations in the paragraphs set forth above as though fully set forth herein.

87.    Plaintiff was Defendants' employee who qualified for leave under the California Family Rights Act ("CFRA").

88.   Defendants are subject to the CFRA, Cal. Govt. Code §12945.

89.   Plaintiff had, at all times relevant, disabilities known to Defendants that have rights under the CFRA, Cal. Govt. Code §12945.

90.   Plaintiff received intermittent leave in compliance with CFRA for his known disabilities.  Plaintiff provided Defendants' insurer, Hartford, with the CFRA completed paperwork and medical certification to support his CFRA.

91.   Defendants fired Plaintiff while he was on CFRA leave.

92.   Defendants invented a pre-textual basis for Plaintiff's termination, even

Though Defendants' discrimination, harassment and retaliation for his CFRA leave were a substantial factor in their decision to terminate him.

93.   Defendant has not been reinstated by Defendants.

94.   Plaintiff has been generally damaged in an amount to be proven at trial.

95.   The misconduct of Defendants, and each of them, was willful, wanton, malicious, intentional, oppressive and despicable and were done with willful and conscious disregard of the rights, welfare and safety of Plaintiff and were done by managerial agents and employees of Defendants and with the express knowledge, consent and ratification of managerial agents and employees of Defendants thereby justifying the awarding of punitive and exemplary damages in an amount to be proven at trial.

96.   As a result of Defendants' misconduct, and each of them, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as specifically provided in the CFRA.

97.   As a result of Defendants' misconduct, and each of them, Plaintiff is entitled to liquidated damages equal to his actual damages as allowed plus interest.

## SIXTH CAUSE OF ACTION FOR VIOLATION
## OF CALIFORNIA WHISTLEBLOWER STATUTE
### [Against All Defendants and DOES 9 to 10]

98.   Plaintiff hereby repeats, re-alleges, and incorporates by reference the allegations in the paragraphs set forth above as if fully set forth herein.

99.   During the entire period of Plaintiff's employment, Plaintiff made numerous and repeated complaints, as set forth herein, to Defendants' managers, supervisors and senior executives of Defendants' violations of state and federal laws and statutes, FINRA rules and their code of ethics and compliance manual.

100.  In violation of California Labor Code §1102.5, Defendants retaliated

against Plaintiff for refusing to violate state and federal laws and statutes, FINRA rules and Defendants' code of ethics and compliance manual and for reporting suspected violations of state and federal laws and statutes, FINRA rules and Defendants' code of ethics and compliance manual, among others.

101. The specific claims subject Defendants' actionable retaliation under California Labor Code §1102.5 are set forth herein.

102. Plaintiff had reasonable cause to believe that violations in the workplace occurred and he dutifully reported them to Defendants for the public benefit, including to preserve the integrity of the financial markets by a major financial institution.

103. Defendants also retaliated against Plaintiff for discussing with Defendants his due and owing wages, including his quarterly bonuses, 2015 bonus and his reimbursable expenses from 2011 to 2016.

104. Plaintiff reported the illegal activities set forth herein to Defendants' supervisors, managers and senior executives.

105. Defendants failed to reasonably adopt and advise Plaintiff of its anti-retaliation policy.

106. Defendants, and each of them, directly and legally caused Plaintiff to suffer actual damages pursuant to California Civil Code §3333 including but not limited to loss of earnings and future earning capacity, including business reputational damages and good will, medical and related expenses for care and procedures both now and in the future, attorneys' fees, and other pecuniary loss not presently ascertainable, for which Plaintiff will disclose them as they are developed in discovery.

107. Defendants, and each of them, directly and legally caused Plaintiff to suffer numerous internal and external injuries and suffering, including but not limited to onset of his disabilities, severe fright, humiliation, shame, shock, pain, discomfort, anxiety and lost confidence to successfully regain the workforce. The

exact nature, extent of his injuries, duration and permanence of his injuries are not known, but Plaintiff will disclose them as they are developed in discovery.

108.   Defendants, and each of them, directly and legally caused Plaintiff to incur expenses for medical care and laboratory costs during the period of Plaintiff's disability, and is informed and believes and alleges that he will incur expenses in the future that are presently unknown, but Plaintiff will disclose them as they are developed in discovery.

109.   Prior the occurrence of the incidents, Plaintiff was an able-bodied individual, but since the incidents, he has been unable to engage fully in his occupation and is informed and believes and alleges that he will incapacitated and unable to perform his usual work for an indefinite period of time in the future and that his damages are presently unknown, but Plaintiff will disclose them as they are developed in discovery.

110.   Defendants, and each of them, directly and legally caused Plaintiff to suffer and continues to suffer severe and permanent emotional and mental distress and anguish, humiliation, embarrassment, fright, shock, pain, discomfort and anxiety. The exact nature of his injuries is presently unknown, but Plaintiff will disclose them as they are developed in discovery.

111.   Plaintiff has been generally damaged in an amount to be proven at trial.

112.   The misconduct of Defendants, and each of them, was willful, wanton, malicious, intentional, oppressive and despicable and were done with willful and conscious disregard of the rights, welfare and safety of Plaintiff and were done by managerial agents and employees of Defendants and with the express knowledge, consent and ratification of managerial agents and employees of Defendants thereby justifying the awarding of punitive and exemplary damages in an amount to be proven at trial.

CIVIL COMPLAINT

113.   As a result of the discriminatory acts of Defendants, and each of them, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as specifically provided in California Labor Code §1021.5.

## SEVENTH CAUSE OF ACTION FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### [Against All Defendants and DOES 4 - 6]

114.   Plaintiff repeats and incorporates herein by reference the allegations in the paragraphs set forth above as though fully set forth herein.

115.   Pursuant to the foregoing alleged acts and misconduct of Defendants, and each of them, Defendants terminated Plaintiff's employment in violation of state and federal laws and public policy.

116.   Defendants' conduct proximately caused economic and non-economic damages to Plaintiff, including but not limited to loss of income, loss of earning capacity, including business reputational damages and good will, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION FOR WILLFUL FAILURE TO PAY WAGES

### [Against All Defendants and DOES 1 to 2]

117.   Plaintiff hereby repeats, re-alleges, and incorporates by reference the allegations in the paragraphs set forth above as if fully set forth herein.

118.   Plaintiff performed "labor" for Defendants within the meaning of Cal. Lab. Code § 200(b).

119.   Plaintiff was entitled to receive compensation for his labor based on his annual productivity in addition to his monthly commissions/draw and quarterly incentives and referral bonuses.

120.   His compensation agreement represents "wages" within the meaning of Cal. Lab. Code § 200(a).

121.   Plaintiff relied on the terms of his employment and his compensation agreement as a substantial and material portion of his total wages.

122.   Pursuant to Cal. Lab. Code § 201, Defendants were obligated to pay Plaintiff's wages upon discharge—or within a reasonable time, not to exceed 72 hours, as necessary for computation and payment thereof.

123.   Plaintiff has still not been paid his full wages as of this filing.

124.   As a direct and proximate result of Defendants' failure to pay the wages due after Plaintiff's termination, he was damaged and continues to suffer damages, and Defendants have been unjustly enriched by an amount to be proven at trial.

125.   Defendants' failure to timely pay Plaintiff's full wages—as required by Cal. Lab. Code §§ 201 or 202, respectively—was a deliberate and intentional decision by them, and each of them.

126.   The intentional and deliberate refusal to timely pay such wages was "willful" within the meaning of Cal. Lab. Code § 203, thereby entitling Plaintiff to statutory penalties under that provision, in an amount to be proven at trial.

127.   In addition, upon prevailing on the claim for failure to timely pay wages, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to Cal. Lab. Code §218.5.

## NINTH CAUSE OF ACTION FOR WILLFUL FAILURE TO INDEMNIFY FOR EXPENSES
### [Against All Defendants and DOES 1 to 2]

128.   Plaintiff hereby repeats, re-alleges, and incorporates by reference the allegations in the paragraphs set forth above as if fully set forth herein.

129.   Labor Code § 2802 provides, in pertinent part: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."

130.   Plaintiff incurred no less than $50,000.00 in necessary expenditures in direct consequence of the discharge of his duties which have yet to be reimbursed by Defendants, despite Plaintiff's demand for reimbursement.

131.   Defendants have acknowledged and affirmed that Plaintiff is owed reimbursement for his business expenses from 2011 to 2016, but have failed to pay such monies owed.

132.   Plaintiff is therefore entitled to an award of his expenses including prejudgment interest and waiting time penalties pursuant to California Labor Code §201, plus attorneys' fees and  costs pursuant to Labor Code § 2802(c) in an amount to proven at trial.

### TENTH CAUSE OF ACTION FOR FAILURE TO PROVIDE REASONABLE ACCOMODATION IN VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT
#### [Against All Defendants and DOES 4 to 6]

133.   Plaintiff hereby repeats, re-alleges, and incorporates by reference the allegations in the paragraphs set forth above as if fully set forth herein.

134.   Defendants were aware at all relevant times that Plaintiff had certain disabilities.

135.   At all relevant times, Plaintiff was able to perform the essential functions of his position while employed by Defendants.

136.   Despite repeated requests by Plaintiff for reasonable adjustments to his office and workspace, Defendants refused to configure Plaintiff's office and

workspace properly, resulting in neck, shoulder and back injuries to Plaintiff.

137.   As a result of the foregoing, Defendants violated the Fair Employment and Housing Act, Cal. Govt. Code § 12940(m).

138.   As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION FOR FAILURE TO ENGAGE IN THE INTERACTICE PROCESS IN VIOLATION OF THE FAIR EMPLOYMENT AND HOUSING ACT
### [Against All Defendants and DOES 4 to 6]

139.   Plaintiff hereby repeats, re-alleges, and incorporates by reference the allegations in the paragraphs set forth above as if fully set forth herein.

140.   Defendants were aware at all relevant times that Plaintiff had certain disabilities.

141.   At all relevant times, Plaintiff was able to perform the essential functions of his position while employed by Defendants.

142.   Despite repeated requests by Plaintiff for reasonable adjustments to his office and workspace, Defendants refused to configure Plaintiff's office and workspace properly, resulting in neck, shoulder and back injuries to Plaintiff.

143.   As a result of the foregoing, Defendants violated the Fair Employment and Housing Act, Cal. Govt. Code § 12940(n).

144.   As a result of the foregoing, Plaintiff has been damaged in an amount to be proven at trial.

## PUNITIVE DAMAGES

145.   As to each and every cause of action for which such relief is available under the applicable law, Plaintiff alleges that the wrongful acts of Defendants, and each of them, were done with fraud, oppression or malice.

146.   Plaintiff is entitled to punitive damages, pursuant to California Civil Code § 3294 *et seq*., and other applicable statutory provisions, in an amount to be determined according to proof at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and each of them as follows:

1.    For general damages in an amount according to proof at trial;

2.    For medical expenses and related items of expense, according to proof at trial;

3.    For loss of earnings, according to proof at trial;

4.    For loss of earning capacity, including business reputational damages and good will, according to proof at trial;

5.    For reasonable attorneys' fees and costs of suit as specifically provided in California Government Code §12965(b), according to proof at trial;

6.    For reasonable attorneys' fees and costs of suit as specifically provided in California Government Code §1021.5, according to proof at trial;

7.    For prejudgment interest, according to proof at trial;

8.    For punitive and exemplary damages, according to proof at trial;

9.    For costs of suit; and

10.    For such other and further relief as the Court may deem just and proper.

//

//

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

**WINGET SPADAFORA &
SCHWARTZBERG, LLP**

Dated:  November 30, 2017     By:     */s/ Brandon S. Reif*

Brandon S. Reif
Rebecca E. MacLaren

Attorneys for Plaintiff

# Exhibit A

Share this article...  

## U.S. Bank recognized by the Ethisphere Institute for the third consecutive year.

U.S. Bank, the fifth largest commercial bank in the United States, announced today that it has been recognized by the Ethisphere Institute, the global leader in defining and advancing the standards of ethical business practices, as a 2017 World's Most Ethical Company®. This marks the third consecutive year U.S. Bank has earned this recognition.






"It is truly an honor to be named a World's Most Ethical Company for the third consecutive year," said Richard Davis, chairman and chief executive officer of U.S. Bank. "As a financial institution, we understand the importance of building and maintaining trust with our customers, communities, and shareholders. And, we are very proud of how the U.S. Bank team strives to be the most trusted choice and how their efforts impact the lives of our customers. I congratulate all of our employees and thank them for their commitment to the highest level of ethics and integrity."

The World's Most Ethical Companies designation recognizes those organizations that understand their role in society to influence and drive positive change, consider the impact of their actions on their employees, investors, customers and other key stakeholders, and use their values and culture as an underpinning to the decisions they make every day.

"We help customers build financially secure futures every day — and those relationships are built on trust," said Andy Cecere, president and chief operating officer for U.S. Bank. "We know we are successful in earning that trust when we collaborate, act responsibly, do the right thing and treat everyone with respect and dignity. We are proud to be on Ethisphere's list because it validates our employees' commitment to our customers and our communities."

U.S. Bank is once again the largest U.S.-based bank being honored by the Ethisphere Institute this year. Being an honoree underscores U.S. Bank's commitment to leading ethical business standards and practices ensuring long-term value creation for key stakeholders, including customers, employees, suppliers, regulators and investors.

The World's Most Ethical Company assessment is based upon the Ethisphere Institute's Ethics Quotient® (EQ) framework which offers a quantitative way to assess a company's performance in an objective, consistent and standardized way. The information collected provides a comprehensive sampling of definitive criteria of core competencies, rather than all aspects of corporate governance, risk, sustainability, compliance and ethics.

Scores are generated in five key categories: ethics and compliance program (35%), corporate citizenship and responsibility (20%), culture of ethics (20%), governance (15%) and leadership, innovation and reputation (10%) and provided to all companies who participate in the process.

"Over the last 11 years we have seen the shift in societal expectations, constant redefinition of laws and regulations and the geo-political climate," said Ethisphere's Chief Executive Officer Timothy Erblich. "We have also seen how companies honored as the World's Most Ethical respond to these challenges. They invest in their local communities, embrace strategies of diversity and inclusion, and implement sustainable business practices. Congratulations to U.S. Bank for its third consecutive recognition as a World's Most Ethical Company."

The full list of the 2017 World's Most Ethical Companies is available on Ethisphere's website. Best practices and insights from the 2017 honorees will be released in a series of infographics and research throughout the year (view or download the 2016 insights). Organizations interested in how they compare to the World's Most Ethical Companies are invited to participate in the Ethics Quotient.

Read more: What is a Chief Ethics Officer?

# Exhibit B

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency    GOVERNOR EDMUND G. BROWN JR.
DIRECTOR KEVIN KISH

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 I TDD (800) 700-2320
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 30, 2017

Rebecca MacLaren
1900 Avenue of the Stars Suite 450
Los Angeles, California 90067

RE:   **Notice to Complainant or Complainant's Attorney**
DFEH Matter Number: 201712-00207701
Right to Sue: Gotses / US Bancorp Holding Company et al.

Dear Complainant or Complainant's Attorney:

Attached is a copy of your amended complaint of discrimination filed with the Department of Fair Employment and Housing (DFEH) pursuant to the California Fair Employment and Housing Act, Government Code section 12900 et seq.

Pursuant to Government Code section 12962, DFEH will not serve these documents on the employer.  You or your attorney must serve the complaint.  If you do not have an attorney, you must serve the complaint yourself.

Be advised that the DFEH does not review or edit the complaint form to ensure that it meets procedural or statutory requirements.

Sincerely,


Department of Fair Employment and Housing